**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**08/20/2018** at 11:03:59 AM
Clerk of the Superior Court
By Yesica Campos,Deputy Clerk

1 **KNIGHT LAW GROUP, LLP**
2 Steve Mikhov (SBN 224676)
stevem@knightlaw.com
3 Amy Morse (SBN 290502)
amym@knightlaw.com
4 10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
5 Telephone: (310) 552-2250
6 Fax: (310) 552-7973

7 Attorneys for Plaintiff,
JOSE GARCIA

8

9

10 **SUPERIOR COURT OF CALIFORNIA**

11 **COUNTY OF ORANGE**

12

13 **JOSE GARCIA,**

Case No.: 30-2018-01013318-CU-BC-CJC
Judge Layne H. Melzer

14
Unlimited Jurisdiction
15        Plaintiff,

16    vs.                              **COMPLAINT**

17
                                     1.  **VIOLATION OF SONG-BEVERLY**
18 **GENERAL MOTORS LLC, a Delaware**      **ACT - BREACH OF EXPRESS**
**Limited Liability Company, and Does 1**   **WARRANTY**
19 **through 10, inclusive,**          2.  **VIOLATION OF SONG-BEVERLY**
                                         **ACT - BREACH OF IMPLIED**
20        Defendant.                      **WARRANTY**
                                     3.  **VIOLATION OF THE SONG-**
21                                       **BEVERLY ACT SECTION 1793.2**
22                                   4.  **FRAUD IN THE INDUCEMENT –**
                                         **INTENTIONAL**
23                                       **MISREPRESENTATION**
24                                   5.  **FRAUD IN THE INDUCEMENT –**
                                         **CONCEALMENT**
25

26 *Assigned for All Purposes to the*
*Honorable*
27

28 Department

-1-

GARCIA v. GENERAL MOTORS LLC COMPLAINT

1  Plaintiff, JOSE GARCIA, alleges as follows against Defendants, GENERAL MOTORS
2  LLC, a Delaware Limited Liability Company, ("GENERAL MOTORS"), and DOES 1 through
3  10 inclusive, on information and belief, formed after an inquiry reasonable under the
4  circumstances:

### DEMAND FOR JURY TRIAL

6  1.  Plaintiff, JOSE GARCIA, hereby demands trial by jury in this action.

7

### GENERAL ALLEGATIONS

9  2.  Plaintiff, JOSE GARCIA, is an individual residing in the City of Westminster, County of
10  Orange, and State of California.

11  3.  Defendant GENERAL MOTORS is and was a Delaware Limited Liability Company
12  registered to do business in the State of California with its registered office in the City of Sacramento,
13  County of Sacramento, and State of California.

14  4.  These causes of action arise out of the warranty obligations of GENERAL MOTORS in
15  connection with a vehicle purchased by Plaintiff and for which GENERAL MOTORS issued a
16  written warranty.

17  5.  Plaintiff does not know the true names and capacities, whether corporate, partnership,
18  associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under
19  the provisions of section 474 of the California Code of Civil Procedure. Defendant Does 1 through
20  10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth
21  herein, and are legally liable to Plaintiff. Plaintiff will seek leave to amend this Complaint to set
22  forth the true names and capacities of the fictitiously named Defendant, together with appropriate
23  charging allegations, when ascertained.

24  6.  All acts of corporate employees as alleged were authorized or ratified by an officer,
25  director, or managing agent of the corporate employer.

26  7.  Each Defendant, whether actually or fictitiously named herein, was the principal, agent
27  (actual or ostensible), or employee of each other Defendant, and in acting as such principal or within
28  the course and scope of such employment or agency, took some part in the acts and omissions

-2-

GARCIA v. GENERAL MOTORS LLC COMPLAINT

1    hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for

2    herein. The sales contract is attached and incorporated by its reference as Exhibit 1.

3        8.      On April 12, 2015, Plaintiff purchased a new 2015 Chevrolet Silverado 2500, VIN:

4    1GC2KVE8XFZ124778, ("the vehicle"). Express warranties accompanied the sale of the vehicle to

5    Plaintiff by which GENERAL MOTORS undertook to preserve or maintain the utility or

6    performance of Plaintiff's vehicle or to provide compensation if there was a failure in such utility or

7    performance.

8        9.      The vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty

9    and developed other serious defects and nonconformities to warranty including, but not limited to

10    the engine.

11        10.    Plaintiff hereby revokes acceptance of the sales contract.

12        11.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code

13    sections 1790 *et seq.* the subject vehicle constitutes "consumer goods" used primarily for family or

14    household purposes, and Plaintiff has used the vehicle primarily for those purposes.

15        12.    Plaintiff is a "buyer" of consumer goods under the Act.

16        13.    Defendant GENERAL MOTORS is a "manufacturer" and/or "distributor" under the

17    Act.

18        14.    Plaintiff hereby demands trial by jury in this action.

19        **GENERAL MOTORS' Plot to Illegally Circumvent Emissions Regulations with the**

20                                     **Duramax Diesel Engine**

21        15.    In advertising its 2011-2016 Chevrolet Silverado HD and 2011-2016 GMC Sierra HD

22    vehicles, GENERAL MOTORS promised that its Duramax engines turned "heavy diesel fuel into a

23    fine mist," delivering "low emissions" that were a "whopping reduction" compared to the prior

24    model. At the same time, GENERAL MOTORS also promised that it had produced a vehicle with

25    "great power." GENERAL MOTORS claimed its engineers had accomplished a "remarkable

26    reduction of diesel emissions."

27        16.    As explained in detail below, this is not what GENERAL MOTORS delivered in the

28    Silverado and Sierra vehicles equipped with Duramax diesel engines currently on the road. In

contrast to GENERAL MOTORS' promises, emissions testing has revealed that the Sierra and Silverado models emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) the Environmental Protection Agency's maximum standards, and (iv) the levels set for the vehicles to obtain a certificate of compliance that allows them to be sold in the United States.

17.    In the last few years, there have been major scandals involving diesel vehicles made by Volkswagen, Audi, Mercedes, and Fiat Chrysler America. Volkswagen pled guilty to criminal violations of the Clean Air Act, Mercedes is under investigation by the Department of Justice, and Fiat Chrysler America has been notified by the EPA that it has violated the Clean Air Act for improper emissions in hundreds of thousands of 2014-2016 Dodge Ram 1500 EcoDiesels and 2014-2016 Jeep Grand Cherokee EcoDiesels. The diesel vehicles made by these manufacturers evade emissions standards with the help of certain software that turns off emissions controls when the vehicles are not being tested.

18.    Plaintiff is informed and believes that testing conducted by engineering experts in emissions indicates that GENERAL MOTORS is no different than those other manufacturers. Its top selling 2011-2016 Silverado and Sierra 2500HD vehicles emit far more pollution on the road than in the emission certification testing environment, and these vehicles exceed federal and state emission standards and employ at least three different "defeat devices" to turn down the emissions controls when the vehicle senses that it is not in the certification test cycle. A defeat device is essentially an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.

19.    Defeat Device No. 1 reduces or de-rates the emissions system when temperatures are above the emissions certification test range (86°F). Defeat Device No. 2 operates to reduce emissions control when temperatures are below the emissions certification low temperature range (68°F). Testing reveals that at temperatures below 68°F (the lower limit of the certification test temperature), stop and go emissions are 2.1 times the emissions standard at 428 mg/mile (compared to the 200 mg/mile standard). At temperatures above 86°F, stop and go emissions are an average of 2.4 times

GARCIA v. GENERAL MOTORS COMPLAINT

the standard with some emissions as high as 5.8 times the standard. These vehicles are operating with the emissions systems de-rated by a material amount of their vehicle miles travelled. The emission scheme, however, is a step more nefarious: Defeat Device No. 3, which reduces the level of emissions controls after 200-500 seconds of steady speed operation in all temperature windows, causes emissions to increase by a factor of 4.5 times on average. It is estimated that due to the temperature-triggered defeat devices, the vehicles operate at 65-70% of their miles driven with emissions that are 2.1 to 5.8 times the standard.

20.   Increased sales and thus increased profits drove GENERAL MOTORS to use at least these three defeat devices in its Duramax diesel engines. By reversing the traditional order of the exhaust treatment components and putting the Selective Catalytic Reduction ("SCR") in front of the Diesel Particulate Filter ("DPF"), GENERAL MOTORS could obtain and market higher power and efficiency from its engines while still passing the cold-start emissions certification tests. This emissions cheating scheme made GENERAL MOTORS' trucks more appealing and competitive in the marketplace, driving up sales and profits, but the reordering would have also drastically increased the need to employ Active Regeneration and other power- and efficiency-sapping exhaust treatment measures, reversing the very advantage gained. GENERAL MOTORS' solution to the reordering problem was to install defeat devices to purposefully reduce SCR dosing, increase NOx emissions, and thus decrease Active Regeneration. The defeat devices allowed GENERAL MOTORS to gain the advantage of hot exhaust going into the SCR system needed to pass cold-start tests, while avoiding the fuel- and power-robbing Active Regeneration procedure that the DPF filter requires when the SCR treatment comes first. GENERAL MOTORS turned a blind eye to the twofold to fivefold increase in NOx emissions its scheme caused—all to drive up its sales and profits.

21.   Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions. Compared to gasoline engines, diesel engines generally produce greater torque, low-end power, better drivability, and much higher fuel efficiency. Unfortunately, these benefits come at the cost of much dirtier and more harmful emissions.

///

GARCIA v. GENERAL MOTORS COMPLAINT

22. One by-product of diesel combustion is NOx. $NO_x$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the air during combustion. NOx pollution contributes to nitrogen dioxide and other particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects. The United States Government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect United States citizens from these pollutants and certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these U.S. laws and must adhere to EPA rules and regulations. This case is not based on these laws but on deception aimed at consumers.

23. Seeing a major opportunity for growth, almost all of the major automobile manufacturers rushed to develop "clean diesel" and promoted new diesel vehicles as environmentally friendly and clean. Volkswagen, Mercedes, GENERAL MOTORS, Fiat Chrysler America, and other manufacturers began marketing diesel cars and trucks as more powerful, yet also as an environmentally friendly alternative to gasoline vehicles. This marketing strategy obviously worked, as millions of diesel vehicles were purchased between 2007 and 2016.

24. The green bubble with respect to diesel vehicles popped on September 18, 2015, when the EPA issued a Notice of Violation of the Clean Air Act to Volkswagen Group of America, Audi AG, and Volkswagen America for installing illegal "defeat devices" in 2009-2015 Volkswagen and Audi vehicles equipped with 2.0-liter diesel engines. A defeat device, as defined by the EPA, is any apparatus that unduly reduces the effectiveness of emissions control systems under conditions a vehicle may reasonably be expected to experience. The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emissions *testing*, while in the real world these vehicles polluted far in excess of emissions standards. The California Air Resources Board also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue.

25. On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emissions testing by U.S.

<div align="center">-6-</div>

<div align="center">GARCIA v. GENERAL MOTORS COMPLAINT</div>

1  regulators. Volkswagen pled guilty to criminal charges and settled civil class actions for over ten

2  billion dollars.

3     26.   Volkswagen wasn't alone—soon, government agencies began to reveal that many

4  manufacturers both in the U.S. and in Europe had produced dozens of models that were exceeding

5  emissions standards. On January 12, 2017, the EPA issued a Notice of Violation to Fiat Chrysler

6  America because it had cheated on its emissions certificates with respect to its popular Dodge Ram

7  and Jeep Grand Cherokee vehicles, and on May 23, 2017 the United States filed a civil suit in the

8  Eastern District of Michigan alleging violations of the Clean Air Act.

9     27.   GENERAL MOTORS is no different. To appeal to environmentally conscious consumers,

10  GENERAL MOTORS markets its 2011-2016 Chevrolet Silverado HD and 2011-2016 GMC Sierra

11  HD vehicles equipped with Duramax diesel engines as having low emissions, high fuel economy,

12  and powerful torque and towing capacity. GENERAL MOTORS charges a premium for diesel-

13  equipped vehicles over comparable gas vehicles.

14     28.   GENERAL MOTORS' representations are deceptive and false, and GENERAL MOTORS

15  sold these vehicles while omitting information that would be material to a reasonable consumer: that

16  GENERAL MOTORS has programmed its Silverado and Sierra Duramax vehicles to significantly

17  reduce the effectiveness of the NOx reduction systems during real-world driving conditions.

18     29.   Plaintiff is informed and believes that testing has confirmed that GENERAL MOTORS'

19  Silverado and Sierra vehicles equipped with Duramax engines produce NOx emissions that are not

20  "reduced" or "low" but in fact exceed emission standards, and that GENERAL MOTORS has

21  programmed the vehicles so that in a wide range of conditions, the emissions control systems are

22  powered down, producing NOx in excess of emissions standards. This testing indicates that

23  GENERAL MOTORS has programmed the software to detect a possible emission testing

24  environment and to comply with emissions requirements in that circumstance, but to turn off the

25  emissions controls when a testing environment is not detected. A reasonable consumer would not

26  expect their Silverado or Sierra vehicle to spew unmitigated NOx in this fashion while driving in the

27  city or on the highway.

28  ///

30.   Plaintiff is informed and believes that the following GENERAL MOTORS models powered by Duramax engines are affected by the unlawful, unfair, deceptive, and otherwise defective emission controls utilized by GENERAL MOTORS: model year 2011-2016 GM Sierra 2500HD and 3500 HD trucks and GM Silverado 2500 HD and 3500 HD trucks (the "Affected Vehicles").

31.   In addition, GENERAL MOTORS markets the Affected Vehicles as fuel efficient, if not the "best" of any full-sized pickup. Without manipulating its software to loosen the emissions controls, GENERAL MOTORS could not achieve the fuel economy and range it promises.

32.   GENERAL MOTORS did not previously disclose to Plaintiff that in real-world driving conditions, the Affected Vehicles can only achieve high fuel economy, power, and durability by reducing emissions controls in order to spew NOx into the air.

33.   GENERAL MOTORS never disclosed to consumers that the Affected Vehicles may be "clean" diesels in very limited circumstances but are "dirty" diesels under most driving conditions. GENERAL MOTORS never disclosed to consumers that it programs its emissions systems to work only under certain conditions. GENERAL MOTORS never disclosed that the Affected Vehicles' emissions materially exceed the emissions from gasoline powered vehicles, that the emissions exceed what a reasonable consumer would expect from a "low emissions" vehicle, and that the emissions materially exceed applicable emissions limits in real-world driving conditions. GENERAL MOTORS collected a premium for these trucks by selling them at thousands of dollars over the cost of a comparable gasoline powered truck.

34.   GENERAL MOTORS' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicle without proper emission controls has caused Plaintiff out-of-pocket loss, and diminished value of his vehicle. GENERAL MOTORS knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable but mistaken belief that his vehicle was a "clean diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately purchased his vehicle, in

1    part, because of the diesel system, as represented through advertisements and representations made
2    by GENERAL MOTORS.

3        35.    Plaintiff recalls that before he purchased the vehicle, he reviewed advertisements on
4    GENERAL MOTORS' website and representations from GENERAL MOTORS' authorized dealer
5    touting the efficiency, fuel economy, and power and performance of the engine. Had GENERAL
6    MOTORS disclosed this design or the fact that the Silverado actually emitted unlawfully high levels
7    of pollutants, Plaintiff would not have purchased the vehicle or would have paid less for it. Plaintiff
8    has suffered an ascertainable loss as a result of GENERAL MOTORS' omissions and/or
9    misrepresentations associated with the Duramax engine system, including but not limited to a high
10   premium for the Duramax engine compared to what he would have paid for a gas-powered engine,
11   out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance
12   of the vehicle, and diminished value of the vehicle. Neither GENERAL MOTORS nor any of its
13   agents, dealers, or other representatives informed Plaintiff of the existence of the unlawfully high
14   emissions and defective nature of the diesel engine system of his Affected Vehicle prior to purchase.

15   **The Environmental Challenges Posed by Diesel Engines and the U.S. Regulatory Response**

16       36.    The U.S. government, through the Environmental Protection Agency (EPA), has passed
17   and enforced laws designed to protect U.S. citizens from pollution and, in particular, certain
18   chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by
19   these laws and must adhere to EPA rules and regulations.

20       37.    The U.S. Clean Air Act has strict emissions standards for vehicles, and it requires vehicle
21   manufacturers to certify to the EPA that the vehicles sold in the U.S. meet applicable federal
22   emissions standards to control air pollution. Every vehicle sold in the U.S. must be covered by an
23   EPA-issued certificate of conformity.

24       38.    There is a very good reason that these laws and regulations exist, particularly in regards to
25   vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle
26   emissions to be carcinogenic and about as dangerous as asbestos.

27       39.    Diesel engines pose a particularly difficult challenge to the environment because they have
28   an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel

-9-

GARCIA v. GENERAL MOTORS COMPLAINT

1  efficiency, the dirtier and more harmful the emissions.

2      40.    Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains,

3  as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures

4  and pressures, which causes the diesel to spontaneously combust. This causes a more powerful

5  compression of the pistons, which produces greater engine torque (that is, more power).

6      41.    The diesel engine is able to do this both because it operates at a higher compression ratio

7  than a gasoline engine and because diesel fuel contains more energy than gasoline.

8      42.    This greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more

9  dangerous emissions. One byproduct of diesel combustion is oxides of nitrogen (NOx), which

10  includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.

11      43.    NOx pollution contributes to nitrogen dioxide and other particulate matter in the air, and

12  reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked

13  with serious health dangers, including asthma attacks and other respiratory illnesses serious enough

14  to send people to the hospital. Ozone and particulate matter exposure have been associated with

15  premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly,

16  and people with pre-existing respiratory illness are at acute risk of health effects from these

17  pollutants. As a ground level pollutant, NO2, a common byproduct of NOx reduction systems using

18  an oxidation catalyst, is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are

19  not sufficiently controlled, then concentrations of NO2 levels at ground level can be quite high,

20  where they have adverse acute health effects.

21                    **The Duramax Engine Emissions Control Components**

22      44.    For the purposes of this complaint, the following terms are used to describe the Duramax

23  engine found in all Affected Vehicles. As related to GENERAL MOTORS' scheme to bypass

24  emissions standards, the critical components of the Duramax Engine are:

25      45.    The Hydrocarbon Injector ("HCI"), which is located in the turbocharger downpipe. The

26  HCI is simply a fuel injector used to inject diesel fuel into the exhaust stream during "active

27  regeneration" (cleaning of the diesel particulate filter). This active regeneration strategy is unique,

28  as the previous version allowed fuel to be injected into the cylinder during the exhaust stroke instead

1   of utilizing a separate injector.

2   46.   The Diesel Oxidation Catalyst ("DOC"), which converts hydrocarbons and carbon

3   monoxide into water and carbon dioxide through an oxidization reaction. The DOC also converts

4   nitric oxide to nitrogen dioxide to generate favorable conditions for the reduction of NOx in the

5   Selective Catalytic Reduction system downstream of the DOC. Finally, the DOC oxidizes fuel

6   injected from the HCI to generate the temperatures required for active regeneration.

7   47.   The Diesel Exhaust Fluid Injector. Diesel Exhaust Fluid (DEF) is injected downstream of

8   the DOC. DEF is composed of 32.5% urea (its active ingredient), distilled water, and a very small

9   amount of additives. Because of its urea content, some call the process "urea injection." DEF is

10  required for the selective catalytic reduction process to occur. The heat of the exhaust converts the

11  DEF into carbon dioxide and ammonia.

12  48.   The Selective Catalytic Reduction ("SCR"). Once DEF is added to the exhaust, it travels

13  through the SCR system. Here, oxides of nitrogen (NOx) are converted to nitrogen gas (N2) and

14  water (H2O) by means of a reduction reaction. The SCR system significantly reduces NOx

15  emissions, reducing the frequency of active regeneration cycles and allowing for more freedom in

16  the calibration of the engine. The drawback of SCR is its increased complexity and the need to carry

17  and replenish the urea fluid.

18  49.   The Diesel Particulate Filter ("DPF"). Once the exhaust stream has been treated by the

19  DOC and SCR, it travels through the DPF, where particulate matter (soot) is trapped and stored. The

20  DPF is cleaned through a process known as regeneration, which is divided into two strategies.

21  Passive regeneration occurs any time the vehicle is being operated and the exhaust gas temperature

22  is high enough to burn the particulate matter trapped by the filter. It is a continuously occurring

23  process, meaning that it naturally occurs whenever the conditions are met under normal operation.

24  Active regeneration occurs only when the engine senses that the DPF needs to be cleaned as the DPF

25  is approaching maximum capacity and generating too much exhaust backpressure. When active

26  regeneration occurs, fuel is injected into the exhaust stream via the HCI to increase the exhaust gas

27  temperature so that the particulate matter can be burned off at carbon's non-catalytic oxidation

28  temperature. Active regeneration dramatically reduces fuel economy since fuel is being used for

-11-

GARCIA v. GENERAL MOTORS COMPLAINT

purposes other than moving the vehicle. The exhaust system features a specifically designed air-cooled exhaust tip to reduce the heat of the exhaust gases as they are expelled. While the DPF is highly effective at trapping particulates, as the amount of particulates accumulates, the resistance to air flow increases also, thus increasing the load of the engine. To purge the DPF of accumulated deposits, it must undergo a regeneration cycle approximately every 500 km, lasting about 30 minutes. DPF regeneration requires high exhaust temperatures of approximately 600°C that are almost never achieved under normal engine operating conditions. Unfortunately, these conditions may not arise in normal driving, requiring the electronic control unit ("ECU") to perform active regeneration. In this mode, the ECU adjusts engine operation to increase exhaust temperature to regenerate the DPF; however, if the vehicle is only driven for short distances, such a temperature may never be reached. At sufficiently high soot load, the vehicle will illuminate a special warning lamp, prompting the driver to drive the vehicle at increased speed to allow active regeneration to take place. Thus, while the DPF is highly effective at reducing particulate emissions, it imposes a performance penalty and can become a hassle for owners who drive their vehicle for short distances.

50. Exhaust gas recirculation ("EGR"). EGR is used to reduce NOx emissions. Since oxides of nitrogen form in oxygen rich, high temperature environments, introducing exhaust gases back into the intake air charge reduces the amount of these compounds that form. Exhaust gas recirculation is not a new technology and has been regularly used on diesel engines for many years.

### Emissions Test Cycles and Emission Standards

51. An emissions test cycle defines a protocol that enables repeatable and comparable measurements of exhaust emissions to evaluate compliance. The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the speed and load over time that is used to simulate a typical driving scenario. The EPA has created a cycle, FTP-75, that is used for emission certification and fuel economy testing of light-duty vehicles in the U.S. The cycle simulates an urban route with frequent stops, combined with both a cold and a hot start transient phase. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of 11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

GARCIA v. GENERAL MOTORS COMPLAINT

52.     Besides urban test cycles such as FTP-75, there are also cycles that simulate driving patterns under different conditions. To assess conformance, several of these tests are carried out on a chassis dynamometer, a fixture that holds a car in place while allowing its drive wheel to turn with varying resistance. Emissions are measured during the test and compared to an emissions standard that defines the maximum pollutant levels that can be released during such a test. In the U.S., emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by the California Air Resources Board ("CARB").

53.     The FTP-75 is the primary dynamometer cycle used to certify the light- and medium-duty passenger cars/trucks. This cycle is primarily a dynamic cycle, with rapid changes in speed and acceleration meant to reflect city driving along with some steadier higher speed sections meant to account for some highway driving.

54.     One critically important thing to understand about the FTP-75 is that it's a "cold start" cycle. That means the vehicle starts the cycle with the engine having been off for at least eight hours and in a completely cold state. The "cold start" portion of the test is challenging for diesel engines employing SCR because catalysts meant to control emissions are not yet at temperatures where they work (i.e., above their "light-off" temperature).

**GENERAL MOTORS Profited from Using Multiple Defeat Devices in Its Duramax Diesel Powertrains**

55.     As noted, the Duramax exhaust treatment system consists of four components: the Exhaust Gas Recirculation System ("EGR"); the Diesel Oxidation Catalyst ("DOC"); the Selective Catalytic Reduction ("SCR") system; and the Diesel Particulate Filter ("DPF"). The DPF traps particulate pollutants (like soot) but has to regenerate regularly in order to maintain low exhaust backpressure. There are two ways the DPF can regenerate: passively through catalysts built into the component ("Passive Regeneration") that use NO2 (nitrogen dioxide) as the primary oxidizer, and actively, where the engine and HCI generate temperatures high enough to oxidize trapped carbon via direct (i.e., non-catalytic) oxidation ("Active Regeneration"). Active Regenerations generally, though not always, require the vehicle to be driven at highway speeds for a continuous period. Active Regeneration reduces fuel economy, decreasing miles per gallon and engine efficiency. Thus,

-13-

GARCIA v. GENERAL MOTORS COMPLAINT

manufacturers like GENERAL MOTORS seek to minimize Active Regeneration cycles. Active Regeneration also leads to excessive NOx and reduces the life span of the SCR catalyst as the high temperatures drive hydrothermal aging and deactivation of the SCR catalyst.

56.    Passive Regeneration relies on the presence of NOx (specifically NO2) to catalytically oxidize captured soot. The catalyst oxidizes nitric oxide to nitrogen dioxide, which then reacts at relatively low temperatures to oxidize and remove captured soot. That is, it works best when the exhaust passing through the DPF still contains high levels of NOx pollutants that trigger the catalyst to regenerate the filter. As a result, most diesel engine manufacturers put the DOC upstream of the SCR system where NOx concentrations are still relatively high and the DPF is more likely to regenerate via the Passive Regeneration mechanism.

57.    While the SCR system is very effective at reducing NOx emissions, it requires hot exhaust for the urea catalyst to function properly. Thus, when it is placed downstream of the DPF, so as to increase Passive Regeneration and decrease the need for Active Regeneration, the system takes some time to warm up and does not work well when the engine system is cold. The DPF absorbs much of the heat during exhaust warmup and delays the time for the SCR catalyst to reach its light-off temperature.

58.    The emissions testing required for trucks to be sold in the United States requires a "cold start" emissions measurement. That is, trucks must emit low levels of NOx even when they have just started and are not yet operating at high exhaust temperatures. GENERAL MOTORS did not want to increase Engine Gas Recirculation ("EGR") or use other inefficient methods to reduce "cold start" emissions, so it departed from the DOC–DPF–SCR order that other manufacturers use and designed its Duramax engines with the SCR system closer to the engine than the DPF.

59.    This configuration allows the SCR system to warm up sooner, thus allowing sufficiently reduced NOx emissions to pass the cold start test required for certification; but there is a catch. Because the NOx is reduced before the exhaust reaches the DPF filter, there is little Passive Regeneration in the DPF. Without relatively high NOx levels going into the DPF, more Active Regenerations would be required, resulting in reduced fuel economy, reduced lifetime of the SCR catalysts, and a significant increase in overall NOx emissions.

60.   GENERAL MOTORS' solution to this problem was to use at least three separate "defeat devices" to increase engine power and efficiency, increase NOx levels into the DPF, and decrease the need for Active Regeneration. These defeat devices are explained in detail below. GENERAL MOTORS did not care that these defeat devices caused the Duramax engine to emit 1.5 to 5.5 times the permissible limit for NOx pollutants during real-world driving.

61.   The defeat devices solved GENERAL MOTORS' problem by decreasing the dosing of urea used by the SCR system and reducing the overall EGR rate: above (Defeat Device 1) and below (defeat device 2) the narrow temperature band in which certification testing is performed (68-86°F); and decreasing the dose of the SCR system and rate of EGR (Defeat Device 3) after 5-8 minutes of relatively constant engine speed (which never happens during an emissions test). By decreasing the dosing of urea, the SCR allows more NOx to pass through to the DPF, thus increasing Passive Regeneration in the DPF and decreasing the need for Active Regenerations, which reduce fuel economy, reduce the lifetime of the SCR catalysts, and result in significant increases in overall NOx emissions. Reduced urea dosing has the added advantage of lower urea consumption, which means lower operating costs and longer service intervals between having to fill the urea catalyst tank.

62.   Thus, by putting the SCR in front of the DPF and employing the defeat devices, GENERAL MOTORS was able to market and sell millions of Duramax-equipped trucks with power and efficiency characteristics that made them very appealing but also caused illegal levels of deadly NOx pollution. If GENERAL MOTORS had not employed illegal defeat devices, then its trucks would have been less efficient and less powerful, meaning that GENERAL MOTORS would not have sold as many and would not have been able to charge as much for them.

**GENERAL MOTORS Promoted the Silverado and Sierra Duramax as Low Emission Vehicles Because It Knew Environmental Impact is Material to a Reasonable Consumer**

63.   GENERAL MOTORS understood that a vehicle's pollution footprint is a factor to be considered in a reasonable consumer's decision to purchase a vehicle. GENERAL MOTORS, in press releases, owner's manuals, and brochures that it intended to reach the eyes of consumers, promoted the Duramax engine as delivering "low emissions" or having "reduced NOx emissions." GENERAL MOTORS was acutely aware of this due to the public perception that diesels are "dirty."

64.   GENERAL MOTORS' brochure for the Sierra Duramax engine promised "low emissions":

> DIRECT INJECTION TECHNOLOGY: For fast starts in cold weather, quiet operation and maximum efficiency, the direct injection system helps Sierra HD with the available DURAMAX diesel engine start in as little as 3 seconds at -40°C and operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, delivering low emissions and great power.

65.   A 2011 Silverado owner's manual promised a 63% reduction in emissions over the previous model:

> New system reduces tailpipe NOx emissions
>
> The enhanced, legendary Duramax 6.6L Turbo-Diesel is the most powerful Duramax ever built-generating more horsepower and torque than any competitor. This proven powerplant gets the job done while being friendlier to the environment.
>
> The improved Duramax uses the latest emission control technology, reducing Nitrogen Oxide (NOx) emissions by a whopping 63%, when compared to the 2010 model. GENERAL MOTORS engineers determined the best way to accomplish this remarkable reduction of diesel emissions was to employ a Selective Catalytic Reduction (SCR) system that uses Diesel Exhaust Fluid (DEF).
>
> Diesel exhaust fluid (DEF)
>
> Diesel Exhaust Fluid (DEF) is a non-flammable fluid comprised of 33% ammonia-based urea and 67% purified water. DEF is used with diesel engine exhaust systems to reduce the amount of emissions produced by turning Nitrogen Oxide (NOx) into nitrogen and water vapor. DEF technology has a proven track record since it has been used in Europe for years.

66.   A 2011 advertisement for the Duramax engine stated:

> 6.6L Duramax LML
> Duramax LML SPECS & INFO
> The LML Duramax was released for 2011 model General Motors & Chevrolet HD trucks. The latest version of the 6.6L Duramax requires advanced emissions equipment, including the use of diesel exhaust fluid injection, to reduce nitrogen oxide emission levels by 63 percent over LMM powered trucks.

///

-16-
GARCIA v. GENERAL MOTORS COMPLAINT

67.   GENERAL MOTORS' advertising for the Sierra consistently featured claims of "low emissions":

> 2016 GMC Sierra 2500HD
> DIRECT INJECTION TECHNOLOGY
>
> For fast starts in cold weather, quiet operation and maximum efficiency, the direct injection system helps Sierra HD with the available Duramax diesel engine start in as little as 3 seconds at -40°C and operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, delivering low emissions and great power.

68.   Another example, from the 2015 GMC Sierra 2500HD brochure, promises "lower emissions":

> FOR FASTER STARTS IN COLD WEATHER, QUIETER OPERATION AND MAXIMUM EFFICIENCY, DIRECT INJECTION HELPS THE AVAILABLE DURAMAX DIESEL START IN AS LITTLE AS 3.0 SECONDS AT -40QF AND OPERATE AT NEARLY 30,000 PSI TO TURN HEAVY DIESEL FUEL INTO A FINE MIST, *BURNING CLEANER AND FASTER WITH LOWER EMISSIONS AND GREATER POWER* THAN THE PREVIOUS MODEL.

69.   An advertisement for the 2014 GMC Sierra 2500HD promises "lower emissions":

> Duramax HIGH-PRESSURE DIRECT INJECTION For fast starts in cold weather, quieter operation and maximum efficiency, the direct-injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower emissions.

70.   An advertisement for the 2013 GMC Sierra 2500HD promises "reduced emissions and a better fuel budget":

> Duramax B20 BIODIESEL CAPABILITY
> To reduce carbon dioxide emissions and stretch your fuel budget, the Duramax 6.6L can operate on B20 biodiesel a mix of 20 percent biodiesel from domestic, renewable resources, and 80 percent petroleum diesel.

71.   An advertisement for the 2012 GMC Sierra 2500HD promises "clean and lower emissions":

> Duramax HIGH-PRESSURE DIRECT INJECTION For fast starts in cold weather, quieter operation and maximum efficiency, the direct injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower

-17-

GARCIA v. GENERAL MOTORS COMPLAINT

emissions and greater power than the previous model.

72.     An owner's manual for the 2011 Duramax vehicles promised a "whopping reduction":

> NEW SYSTEM REDUCES TAILPIPE NOx
> EMISSIONS
>
> The enhanced, legendary Duramax 6.6L Turbo-Diesel is the most powerful Duramax ever built-generating more horsepower and torque than any competitor. This proven powerplant gets the job done while being friendlier to the environment.
>
> The improved Duramax uses the latest emission control technology, reducing Nitrogen Oxide (NOx) emissions by a whopping 63%, when compared to the 2010 model. GENERAL MOTORS engineers determined the best way to accomplish this remarkable reduction of diesel emissions was to employ a Selective Catalytic Reduction (SCR) system that uses Diesel Exhaust Fluid (DEF).

73.     A 2011 GENERAL MOTORS press release promised more power and lower emissions:
> New 6.6L Duramax diesel delivering more power, up to 11-percent greater highway fuel economy up to 63- percent lower emissions, B20 biodiesel capability and quicker acceleration.

**Vehicles Equipped with the Duramax Diesel Engine do not Perform as Advertised due to**

**Defeat Devices**

74.     Plaintiff is informed and believes that testing shows that the Affected Vehicles comply with emissions standards at the temperature windows where the emissions test are performed for certification. The NOx emissions increase significantly when the temperature is below 68°F or above 86°F. This means that GENERAL MOTORS, using software supplied by Robert Bosch GMBH ("Bosch"), employs a "defeat device" that allows the vehicle to meet emissions standards in the test temperature range. At all other times, NOx is allowed to be emitted in a much greater amount.

75.     Testing confirms the existence of three "defeat devices." The three cheats, or defeat devices, are:

   a.   Defeat Device No. 1: The vehicles produce emissions above the certification tests at temperatures above the certification range (86°F).

   b.   Defeat Device No. 2: The vehicles produce higher emissions when temperatures are

-18-

GARCIA v. GENERAL MOTORS COMPLAINT

1    below the certification test range (68°F).

2       c.  Defeat Device No. 3: Higher emissions occur after the vehicle has been run for 200-

3    500 seconds of steady speed operation on average by a factor of 4.5 in all temperature

4    windows.

5    76.    All modern engines are integrated with sophisticated computer components to

6 manage the vehicle's operation, such as an electronic diesel control ("EDC"). Bosch tested,

7 manufactured, and sold the EDC system used by Volkswagen, Fiat Chrysler, Mercedes, and

8 GENERAL MOTORS. This system is more formally referred to as the Electronic Diesel Control

9 Unit 17 ("EDC Unit 17"). The EDC Unit 17 was tested, manufactured, and sold by Bosch. Upon its

10 introduction, EDC Unit 17 was publicly touted by Bosch as follows:

11        … EDC17 … controls every parameter that is important for effective,
12        low-emission combustion.

13        Because the computing power and functional scope of the new EDC17
           can be adapted to match particular requirements, it can be used very
14       flexibly in any vehicle segment on all the world's markets. In addition
           to controlling the precise timing and quantity of injection, exhaust gas
15       recirculation, and manifold pressure regulation, it also offers a large
           number of options such as the control of particulate filters or systems
16       for reducing nitrogen oxides. The Bosch EDC17 determines the
           injection parameters for each cylinder, making specific adaptations if
17       necessary. This improves the precision of injection throughout the
           vehicle's entire service life. The system therefore makes an important
18       contribution to observing future exhaust gas emission limits.[1]

19    77.   EDC Unit 17 was widely used throughout the automotive industry, including BMW and

20 Mercedes, to operate what were marketed as modern clean diesel engines. Bosch worked with each

21 vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software

22 codes to manage the vehicle's engine operation.

23    78.   With respect to the Affected Vehicles, however, EDC Unit 17 was also enabled by Bosch

24 and GENERAL MOTORS to surreptitiously evade emissions regulations. Bosch and GENERAL

25 MOTORS worked together to develop and implement a specific set of software algorithms for

26 implementation in the Affected Vehicles, which enabled GENERAL MOTORS to adjust fuel levels,

27 exhaust gas recirculation, air pressure levels, and even urea injection rates. When carmakers test

28

---

[1] *See* February 28, 2006, Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en

-19-

their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Volkswagen, GENERAL MOTORS, and other manufacturers the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software codes within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the vehicle to return to full power while reducing the emissions control systems' performance, and consequently, caused the car to spew the full amount of NOx emissions out on the road, in excess of California's emissions standards.

79. This workaround was illegal. The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also* 40 C.F.R. § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the Clean Air Act prohibits the sale of components used as defeat devices "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a Certificate of Compliance ("COC"), automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

80. Additionally, California's regulatory agency, CARB, requires that automakers complete an application and obtain an Executive Order ("EO"), confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

81. Thus, in order to obtain the COCs and EOs necessary to sell their vehicles, GM did not disclose, and affirmatively concealed from government regulators, the presence of the test-detecting and performance-altering software code that it developed with Bosch, thereby making that software an illegal defeat device. In other words, GENERAL MOTORS, working closely with Bosch, lied to the government, its customers, its dealers, and the public at large.

82. Because the COCs were fraudulently obtained, and because the Affected Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Affected Vehicles were never covered by a valid COC, and thus were never legal for sale, nor were they EPA and/or CARB compliant as represented. GENERAL MOTORS and Bosch hid these facts from the EPA, CARB and other regulators, its dealers, and consumers, and it continued to sell and lease the Affected Vehicles to the driving public despite their illegality. On information and reasonable belief, Plaintiff alleges that the same level of coordination between Bosch and Volkswagen (as alleged in the various complaints against Volkswagen consolidated in *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, United States District Court, Northern District of California, MDL No. 2672 CRB (JSC)) also occurred between Bosch and GENERAL MOTORS.

83. GENERAL MOTORS will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their fuel efficiency. As a result, even if GENERAL MOTORS and Bosch are able to make Affected Vehicles EPA-compliant, consumers will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This change will necessarily result in a diminution in value of every Affected Vehicle and it will cause owners of Affected Vehicles to pay more for fuel while using their Affected Vehicles.

84. Plaintiff and other purchasers/lessees of Affected Vehicles paid a premium, as GENERAL MOTORS charged more for its diesel car than a comparable gas car.

85. As a result of GENERAL MOTORS' unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles are not "clean" diesels, emit more pollutants than do gasoline powered vehicles, and emit more

1 pollutants than permitted under federal and state laws, owners and/or lessees of the Affected

2 Vehicles have suffered losses in money and/or property. Had Plaintiff known of the higher emissions

3 at the time he purchased or leased his Affected Vehicles, he would not have purchased or leased the

4 vehicle, or would have paid substantially less for the vehicle than he did. Moreover, when and if

5 GENERAL MOTORS recalls the Affected Vehicles and degrades the GENERAL MOTORS Clean

6 Diesel engine performance and fuel efficiency in order to make the Affected Vehicles compliant

7 with EPA and CARB standards, Plaintiff will be required to spend additional sums on fuel and will

8 not obtain the performance characteristics of his vehicle as advertised when purchased. Moreover,

9 Affected Vehicles will necessarily be worth less in the marketplace because of their decrease in

10 performance and efficiency and increased wear on their cars' engines.

11    86.    Without cheating emissions, GENERAL MOTORS could not achieve the fuel economy

12 and range that it promises. Moreover, when and if GENERAL MOTORS recalls the Affected

13 Vehicles and degrades the Duramax engine performance in order to make the Affected Vehicles

14 compliant with EPA standards, Plaintiff and other Affected Vehicle owners/lessees will be required

15 to spend additional sums on fuel and will not obtain the enhanced performance characteristics of

16 their vehicles when purchased. Affected Vehicles will necessarily be worth less in the marketplace

17 because of their decrease in performance and efficiency and increased wear on their vehicles'

18 engines.

19    **All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of**

20    **Fraudulent Concealment**

21    87.    GENERAL MOTORS misrepresented the qualities of the 2015 Chevrolet Silverado

22 2500HD to Plaintiff at the time of the sale of the vehicle. GENERAL MOTORS also concealed the

23 fact that the engine was defective.

24    88.    GENERAL MOTORS continued to misrepresent its ability to repair the vehicle in

25 conformity with the warranty throughout the warranty period.

26    89.    At all relevant times, GENERAL MOTORS was aware of the defects in the 2015

27 Chevrolet Silverado 2500HD and other vehicles equipped with its Duramax diesel engine.

28 ///

90.    As described above, GENERAL MOTORS knew about, or recklessly disregarded the inadequate emission controls during normal driving conditions. At no point prior to the sale of the vehicle to Plaintiffs or during Plaintiffs' ownership of the Vehicle did GENERAL MOTORS or an authorized dealer ever inform Plaintiffs of the ongoing defect.

91.    GENERAL MOTORS had a duty to disclose the concealed facts alleged above because GENERAL MOTORS knew that Plaintiffs did not know a material fact and further knew that such facts were not readily accessible to Plaintiffs because GENERAL MOTORS actively concealed those facts.

92.    GENERAL MOTORS had a duty to disclose the concealed facts alleged above because GENERAL MOTORS made misrepresentations in its marketing materials and through its authorized sales representatives about the quality and characteristics of the 2015 Chevrolet Silverado 2500HD.

93.    GENERAL MOTORS had a duty to disclose the concealed facts alleged above because GENERAL MOTORS actively concealed material facts in order to induce a false belief.

94.    GENERAL MOTORS intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the defective Duramax diesel engine could not be repaired.

95.    Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's defects to Plaintiff, and Defendant failed to disclose its inability to repair these defects that prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiff, the fact that the dealers were not properly repairing the defects to the 2015 Chevrolet Silverado 2500HD. GENERAL MOTORS knew that the limited work that it had authorized its dealerships to perform on those vehicles would not properly repair them.

96.    After emissions investigation conducted by the California Air Resources Board ("CARB") into the Volkswagen TDI "clean" diesel automobiles found that the Volkswagen vehicles produced levels of $NO_x$ up to 40 times higher than legal limits promulgated by the CARB, the climate surrounding automobile manufacturers created an air of suspicion and distrust amongst consumers. Volkswagen was not the only manufacturer investigated for emissions cheating. FCA US, LLC and Mercedes were also among the manufacturers that were investigated for similar misconduct.

-23-
GARCIA v. GENERAL MOTORS COMPLAINT

1   GENERAL MOTORS was not exempt from these investigations, however, this investigation was

2   not of the same magnitude as the Volkswagen investigation.

3       97.   After much scrutiny into GENERAL MOTORS and its diesel engines, a class action

4   complaint was filed on May 25, 2017, alleging that GENERAL MOTORS had defrauded customers

5   by withholding the fact that the Duramax diesel engine was equipped with three emission defeat

6   devices, designed to lower emissions when in a testing environment. The filing of the *Fenner v.*

7   *General Motors, LLC* class action complaint is the earliest date Plaintiff could have had notice of

8   the facts giving rise to his fraud causes of action. Plaintiff could not, even with reasonable and

9   diligent investigation, have discovered Plaintiff's claims on an earlier date because of GENERAL

10   MOTORS' fraudulent misrepresentations and concealment of the defects in Plaintiff's vehicle, as

11   previously alleged above, and because of the repeated false assurances from GENERAL MOTORS

12   and its service dealership agents to Plaintiff, on which Plaintiff reasonably relied, that GENERAL

13   MOTORS had and would repair any problems with the engine in Plaintiff's vehicle that occurred

14   during the express warranty period. The statute of limitations for each of Plaintiff's claims against

15   GENERAL MOTORS is therefore tolled under the delayed discovery rule and the doctrine of

16   fraudulent concealment until on or around May 25, 2017, the date on which the *Fenner v. General*

17   *Motors, LLC* class action was filed.

18       98.   Because GENERAL MOTORS failed to disclose these foregoing facts to Plaintiff, all

19   statute of limitations periods with respect to sale of the Vehicle were tolled by the doctrines of

20   fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, GENERAL

21   MOTORS wrongfully concealed the fact (1) that the Vehicle was equipped with engine that suffered

22   from defects and/or latent defects, and (2) that its dealerships were making inadequate repairs that

23   were incapable of addressing the root cause of the Vehicle's malfunctions.

24       99.   Plaintiff did not discover the operative facts that are the basis of the claims alleged herein

25   because the facts were concealed in confidential and privileged documents, which a consumer would

26   not know about and could not obtain.

27       100.  No amount of diligence by Plaintiff could have led to the discovery of these facts because

28   they were kept secret by GENERAL MOTORS and, therefore, Plaintiff was not at fault for failing

1  to discover these facts.

2  101. Plaintiff did not have actual knowledge of facts sufficient to put him on notice. Plaintiff

3  did not know, nor could have known, about GENERAL MOTORS' inability to repair the defects in

4  the 2015 Chevrolet Silverado 2500HD because, as alleged above, GENERAL MOTORS kept this

5  information highly confidential, and its dealership assured Plaintiff that its repairs were effective.

6  **All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in**

7  ***American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class**

8  **Action *Fenner v. General Motors LLC***

9  102. Defendant had timely notice of Plaintiff's claims against GENERAL MOTORS in the

10  present action because Plaintiff is a putative class member in a class action, *Fenner et al. v. General*

11  *Motors LLC*, United States District Court, Eastern District of Michigan, Case No. 2:17-cv-11661-

12  GCS-APP, which was filed on May 25, 2017 ("*Fenner v. General Motors LLC*"). Plaintiff could not

13  have reasonably discovered facts giving rise to his claims until February 22, 2018, at the earliest.

14  Once the *Fenner v. General Motors LLC* class action was filed, the remainder of any relevant statute

15  of limitations was tolled. As the *Fenner v. General Motors LLC* class action is still ongoing, all

16  relevant statutes of limitations are still being tolled.

17  103. While Plaintiff is a putative class member in the *Fenner v. General Motors LLC* class

18  action, Plaintiff did not and could not have reasonably known of the class action, nor was he aware

19  of the allegations contained therein. Plaintiff is not a named member in the *Fenner v. General Motors*

20  *LLC* class action, only a putative member. Moreover, Plaintiff had no notice of the *Fenner v. General*

21  *Motors LLC* class action or his fraud claims because Plaintiff has never been served with a copy of

22  the *Fenner v. General Motors LLC* complaint, nor has he received any other notice thereof.

23  104. There is no prejudice to GENERAL MOTORS in gathering evidence to defend against

24  Plaintiff's individual claims because the class definition in the class action complaint within which

25  Plaintiff    is a putative class member and the allegations in the class action lawsuit, *Fenner v.*

26  *General Motors LLC*, put GENERAL MOTORS on notice of the facts that give rise to Plaintiff's

27  individual action, the witnesses necessary for GENERAL MOTORS to defend Plaintiff's individual

28  action, and the causes of action against GENERAL MOTORS asserted in Plaintiff's individual

-25-

action.

105. *Fenner v. General Motors LLC* alleged the material facts on behalf of Plaintiff as a putative class member as are being alleged by Plaintiffs in the present individual action.

106. The facts alleged in *Fenner v. General Motors LLC* are substantially similar, if not identical to the facts alleged herein.

107. The allegations in *Fenner v. General Motors LLC* are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

108. The *Fenner v. General Motors LLC* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

109. The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

110. The running of all statute of limitations on each of Plaintiff's claims asserted against GENERAL MOTORS in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Fenner v. General Motors LLC* class action (i.e., from the date on which the *Fenner v. General Motors LLC* class action was filed on May 25, 2017, to the present date, because the class action is ongoing).

**All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable Tolling As a Result of the Class Action *Fenner v. General Motors LLC***

111. Defendant had timely notice of Plaintiff's claims against GENERAL MOTORS in the present action because Plaintiff is a putative class member in a class action, *Fenner et al. v. General Motors LLC*, United States District Court, Eastern District of Michigan, Case No. 2:17-cv-11661-GCS-APP, which was filed on May 25, 2017 ("*Fenner v. General Motors LLC*"). Plaintiff could not

1  have reasonably discovered facts giving rise to his claims until February 22, 2018 at the earliest.

2  Once the *Fenner v. General Motors LLC* class action was filed, the remainder of any relevant statute

3  of limitations was tolled. As the *Fenner v. General Motors LLC* class action is still ongoing, all

4  relevant statutes of limitations are still being tolled.

5     112. While Plaintiff is a putative class member in the *Fenner v. General Motors LLC* class

6  action, Plaintiff did not and could not have reasonably known of the class action, nor was he aware

7  of the allegations contained therein. Plaintiff is not a named member in the *Fenner v. General Motors*

8  *LLC* class action, only a putative member. Moreover, Plaintiff had no notice of the *Fenner v. General*

9  *Motors LLC* class action or his fraud claims because Plaintiff has never been served with a copy of

10  the *Fenner v. General Motors LLC* complaint, nor has he received any other notice thereof.

11     113. There is no prejudice to GENERAL MOTORS in gathering evidence to defend against

12  Plaintiff's individual claims because the class definition in the class action complaint within which

13  Plaintiff is a putative class member and the allegations in the class action lawsuit, *Fenner v. General*

14  *Motors LLC*, put GENERAL MOTORS on notice of the facts that give rise to Plaintiff's individual

15  action, the witnesses necessary for GENERAL MOTORS to defend Plaintiff's individual action, and

16  the causes of action against GENERAL MOTORS asserted in Plaintiff's individual action.

17     114. *Fenner v. General Motors LLC* alleged the material facts on behalf of Plaintiff as a putative

18  class member as are being alleged by Plaintiff in the present individual action.

19     115. The facts alleged in *Fenner v. General Motors LLC* are substantially similar, if not identical

20  to the facts alleged herein.

21     116. The allegations in *Fenner v. General Motors LLC* are based on the same subject matter and

22  similar evidence as the instant complaint. Those allegations concern the same evidence, memories,

23  and witnesses as the subject matter in the instant complaint.

24     117. The *Fenner v. General Motors LLC* class action certainly protected the efficiency and

25  economy of litigation because that class action is protecting the rights of thousands of consumers

26  nationwide through a single action. Consumer class actions regarding defective vehicles brought

27  against manufacturers are regularly certified, making a class action lawsuit an efficient means of

28  pursuing such claims.

118. Plaintiff acted reasonably and in good faith in filing the instant action. Shortly after discovering GENERAL MOTORS' fraudulent behavior, Plaintiff filed the instant action to pursue his individual rights without delay.

119. The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

120. The running of all statute of limitations on each of Plaintiff's claims asserted against GENERAL MOTORS in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Fenner v. General Motors LLC* class action (i.e., from the date on which the *Fenner v. General Motors LLC* class action was filed on May 25, 2017, to the present date, because the class action is ongoing).

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty

121. Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

122. Express warranties accompanied the sale of the vehicle to Plaintiff by which GENERAL MOTORS undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or to provide compensation if there was a failure in such utility or performance.

123. The vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to, engine, electrical and transmission.

124. Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiff has used the vehicle primarily for those purposes.

125. Plaintiff is the "buyer" of consumer goods under the Act.

126. Defendant GENERAL MOTORS is a "manufacturer" and/or "distributor" under the Act.

///

-28-

GARCIA v. GENERAL MOTORS COMPLAINT

127. The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the vehicle.

128. Plaintiff delivered the vehicle to an authorized GENERAL MOTORS repair facility for repair of the nonconformities.

129. Defendant was unable to conform Plaintiff's vehicle to the applicable express after a reasonable number of repair attempts.

130. Notwithstanding Plaintiff's entitlement, Defendant GENERAL MOTORS has failed to either promptly replace the used motor vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

131. By failure of Defendant to remedy the defects as alleged above, or to issue a refund or replacement vehicle, Defendant is in breach of its obligations under the Song-Beverly Act.

132. Under the Act, Plaintiff is entitled to reimbursement of the price paid for the vehicle less that amount directly attributable to use by the Plaintiff prior to discovery of the nonconformities.

133. Plaintiff is entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with its obligations under the Song-Beverly Act.

134. Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

135. Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages for GENERAL MOTORS' willful failure to comply with its responsibilities under the Act.

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

136. Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

137. GENERAL MOTORS and its authorized dealership at which Plaintiff purchased the subject vehicle had reason to know the purpose of the subject vehicle at the time of sale of the subject

-29-

1   vehicle. The sale of the subject vehicle was accompanied by an implied warranty of fitness.

2        138.   The sale of the subject vehicle was accompanied by an implied warranty that the subject

3   vehicle was merchantable pursuant to Civil Code section 1792.

4        139.   The subject vehicle was not fit for the ordinary purpose for which such goods are used

5   because it was equipped with a defective engine, electrical and transmission.

6        140.   The subject vehicle did not measure up to the promises or facts stated on the container or

7   label because it was equipped with a defective engine, electrical and transmission.

8        141.   The subject vehicle was not of the same quality as those generally acceptable in the trade

9   because it was equipped with a defective engine, electrical and transmission.

10       142.   Plaintiff is entitled to justifiably revoke acceptance of the subject vehicle under Civil

11   Code, section 1794, et seq;

12       143.   Plaintiff hereby revokes acceptance of the subject vehicle.

13       144.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code, section

14   1794, et seq.

15       145.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code, section 1794, et

16   seq. and Commercial Code, section 2711.

17       146.   Plaintiff is entitled to recover any "cover" damages under Commercial Code, sections

18   2711, 2712, and Civil Code, section 1794, et seq.

19       147.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794

20   et seq and Commercial Code, sections 2711, 2712, and 2713 et seq.

21                 **THIRD CAUSE OF ACTION**

22          **Violation of the Song-Bervely Act Section 1793.2**

23       148.   Plaintiff incorporates herein by reference each and every allegation contained in the

24   preceding and succeeding paragraphs as though herein fully restated and re-alleged.

25       149.   Pursuant to Civil Code, section 1793.2, subdivision (a) a manufacturer that sells

26   consumer goods in California, for which it has made an express warranty, shall maintain service and

27   repair facilities or designate and authorize independent service and repair facilities to carry out the

28   terms of those warranties.

150.   Pursuant to Civil Code, section 1793.2, subdivision (b), when service and repair of goods is necessary because they do not conform with the applicable express warranties, service and repair shall be commenced within a reasonable time by the manufacturer or its representative.

151.   Civil Code, section 1793.2, subdivision (b) further states that goods shall be serviced or repaired so as to conform to the applicable warranties within 30 days.

152.   The sale of the subject vehicle was accompanied by express warranties, including a warranty guaranteeing that the subject vehicle was safe to drive and not equipped with defective parts, including the engine, electrical and transmission.

153.   Plaintiff delivered the subject vehicle to GENERAL MOTORS' authorized service representative(s), Momentum Chevrolet, on multiple occasions. The subject vehicle was delivered for repairs of the engine, electrical and transmission which amount to nonconformities to the express warranties that accompanied the sale of the subject vehicle.

154.   Since delivery of the subject vehicle to Momentum Chevrolet, over thirty days have past and GENERAL MOTORS and Momentum Chevrolet, have failed to tender the subject vehicle back to Plaintiff in conformance with its warranties.

155.   Plaintiff is entitled to justifiably revoke acceptance of the subject vehicle under Civil Code, section 1794, *et seq*;

156.   Plaintiff hereby revokes acceptance of the subject vehicle.

157.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code, section 1794, *et seq*.

158.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq*. and Commercial Code, section 2711.

159.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code, section 1794, *et seq*.

160.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections, 2711, 2712, and 2713 *et seq*.

161.   Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages in that GENERAL MOTORS has willfully failed to comply

-31-

GARCIA v. GENERAL MOTORS COMPLAINT

1   with its responsibilities under the Act.

2   <center>**FOURTH CAUSE OF ACTION**</center>

3   <center>**Fraud in the Inducement – Intentional Misrepresentation**</center>

4   162.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth
5   herein.

6   163.   Defendant GENERAL MOTORS made multiple public representations about
7   quantifiable qualities of the Duramax engine, including statements regarding its emissions, its
8   compliance with government regulations, fuel efficiency, power, and drivability.

9   164.   Defendant GENERAL MOTORS drafted, produced, and distributed marketing
10  brochures to the public containing factual representations about the Duramax engine. Defendant
11  GENERAL MOTORS also engaged in a nationwide television and print advertising campaigns
12  containing factual representations about the Duramax engine. GENERAL MOTORS' marketing the
13  Vehicle represented the Duramax engine's "green" technology, as further described above.

14  165.   Unfortunately, the Vehicle as delivered to Plaintiff was equipped with "defeat device" that
15  was specifically designed to circumvent government environmental regulations, including
16  California emissions standards, and to defraud the public at large, including Plaintiff.

17  166.   The defeat device was not a defect exclusive to Plaintiff's vehicle but was intentionally
18  designed by Defendant with the intent to defraud government regulators and the public by
19  convincing them that Duramax engine equipped vehicles actually complied with government
20  environmental regulations, including California's emissions standards. GENERAL MOTORS had
21  exclusive knowledge of this fact and concealed information to fraudulently induce Plaintiff and other
22  consumers into purchasing vehicles equipped with the Duramax engine and the defeat device. As
23  such, the defeat device is more than just a non-conformity to the Vehicle's warranties, but, rather,
24  the basis of a wide-ranging fraud and a breach of a separate duty that arises from GENERAL
25  MOTORS's exclusive knowledge and concealment of the defeat device.

26  167.   GENERAL MOTORS made such representations regarding Duramax engine despite its
27  extensive internal knowledge of the defeat devices and the poor emissions performance. GENERAL
28  MOTORS knew these representations were false when made.

<center>-32-</center>
<center>GARCIA v. GENERAL MOTORS COMPLAINT</center>

168. Defendants intended that Plaintiff rely on the representations made in marketing brochure and add campaigns related to the Duramax engine in inducing Plaintiff to purchase the Vehicle.

169. Plaintiff reasonably relied on Defendant's representations related to the Vehicle being "clean diesel" and "green" because GENERAL MOTORS was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the Vehicle's emissions in compliance with California's rigorous emissions standards. Defendant GENERAL MOTORS was in a superior position of knowledge.

170. Plaintiff was harmed by purchasing a vehicle that Plaintiff would not have purchased had he known the true facts about the defeat device and the Vehicle's actual emissions.

171. Plaintiff's reliance on Defendants' representations about the Vehicle's "green" qualities was a substantial factor in Plaintiff's harm, as GENERAL MOTORS and its agents were the exclusive source of information about the emissions qualities, the defeat device, and the intent to defraud the public.

## FIFTH CAUSE OF ACTION

### Fraud in the Inducement – Concealment

172. Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

173. Defendant GENERAL MOTORS and its agents intentionally concealed and failed to disclose facts relating to defeat devices employed in vehicles equipped with the Duramax diesel engine, including the Subject Vehicle, and the Subject Vehicle's non-conformance with United States and California emission standards. Specifically, GENERAL MOTORS intentionally concealed that the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions, that the Affected Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of GENERAL MOTORS' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or GENERAL MOTORS acted with reckless disregard for the truth and denied Plaintiff and the other purchasers/lessees of Affected Vehicles information that is highly relevant to

1    their purchasing decision.

2        174. Defendant GENERAL MOTORS was the only party with knowledge of the Duramax

3    defeat device because that knowledge came from an intentional scheme to defraud government

4    regulators and consumers, including the United States EPA, CARB and Plaintiff. None of this

5    information was available to the public, nor did Defendant publicly or privately disclose any of the

6    information to Plaintiff. GENERAL MOTORS had exclusive knowledge of the defect.

7        175. Defendant GENERAL MOTORS actively concealed information from the public,

8    preventing Plaintiff from discovering any of the concealed facts regarding the defeat device and the

9    truth about the Duramax engine emissions.

10       176. Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts,

11   Defendant had an opportunity to disclose to Plaintiff, but instead concealed from and failed to

12   disclose to Plaintiff, any of the known irreparable issues with the Vehicle, including the existence

13   of the Duramax engine's defeat devices.

14       177. Defendant GENERAL MOTORS intended to deceive Plaintiff by concealing the

15   existence of the Duramax engine's defeat device, in an effort to sell the Vehicle at a maximum price.

16       178. Prior to the sale of the Vehicle Defendant GENERAL MOTORS knew that the Duramax

17   defeat device was intended to use it to defraud CARB and the general public, including Plaintiff.

18   Defendant GENERAL MOTORS specifically designed the Duramax defeat device to fraudulently

19   circumvent emissions regulations and to trick the public into purchasing vehicles that could not

20   deliver on their emissions promises. Defendant GENERAL MOTORS intended the Vehicle to be

21   sold to the public, including Plaintiff, with the fraudulent defeat device.

22       179. GENERAL MOTORS had a duty to disclose the emissions defect, defective design of the

23   emissions controls, and violations with respect to the Affected Vehicles because details of the true

24   facts were known and/or accessible only to GENERAL MOTORS, because GENERAL MOTORS

25   had exclusive knowledge as to such facts, and because GENERAL MOTORS knew these facts were

26   not known to or reasonably discoverable by Plaintiff. GENERAL MOTORS also had a duty to

27   disclose because it made general affirmative representations about the qualities of its vehicles with

28   respect to emissions, starting with references to them as reduced emissions diesel cars and as

1   compliant with United States and California law, which were misleading, deceptive, and incomplete
2   without the disclosure of the additional facts set forth above regarding the actual emissions of its
3   vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and
4   emissions regulations, and its actual practices with respect to the vehicles at issue. Having
5   volunteered to provide information to Plaintiff, GENERAL MOTORS had the duty to disclose not
6   just the partial truth, but the entire truth. These omitted and concealed facts were material because
7   they directly impact the value of the Affected Vehicles purchased or leased by Plaintiff and others.
8   Whether a manufacturer's products pollute, comply with federal and state clean air laws and
9   emissions regulations, and whether that manufacturer tells the truth with respect to such compliance
10  or non-compliance are material concerns to a consumer, including with respect to the emissions
11  certifications testing their vehicles must pass. GENERAL MOTORS represented to Plaintiff that he
12  was purchasing a reduced-emission diesel vehicle when, in fact, he was purchasing a defective and
13  unlawfully high-emission vehicle.

14      180.  GENERAL MOTORS actively concealed and/or suppressed these material facts, in whole
15  or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean
16  diesel vehicles and did not or could not comply with federal and state laws governing clean air and
17  emissions, which perception would hurt the brand's image and cost GENERAL MOTORS money,
18  and it did so at the expense of Plaintiff.

19      181.  Plaintiff did not know about the Duramax defeat device, the Vehicle's non-conformance
20  with California emissions regulations, or GENERAL MOTORS' plan to defraud consumers at the
21  time of sale.

22      182.  Had Defendant GENERAL MOTORS and/or its agents publicly or privately disclosed the
23  existence of the Duramax defeat device or the Vehicle's failure to conform to California emissions
24  standards to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Vehicle.

25      183.  Plaintiff was harmed by Defendant's concealment of the Duramax defeat device because
26  Plaintiff was induced to enter into the sale of a vehicle that Plaintiff would not have otherwise
27  purchased.

28  ///

184. Defendant's concealment of the defeat device and the fact that the Vehicle failed to conform to California emissions regulations was a substantial factor in causing Plaintiff's harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

1.  For general, special and actual damages according to proof at trial;

2.  For rescission of the purchase contract and restitution of all monies expended;

3.  For diminution in value;

4.  For incidental and consequential damages according to proof at trial;

5.  For civil penalty in the amount of two times Plaintiff's actual damages;

6.  For prejudgment interest at the legal rate;

7.  For punitive damages;

8.  For reasonable attorney's fees and costs of suit; and

9.  For such other and further relief as the Court deems just and proper under the circumstances.

Dated: 8/20/18

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
Attorneys for Plaintiff,
JOSE GARCIA

Plaintiff, JOSE GARCIA, hereby demands trial by jury in this action.

# EXHIBIT 1

## RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE
### (WITH ARBITRATION PROVISION)

Dealer Number _____ Contract Number _____ R.O.S. Number _____ Stock Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| | | |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| | | | | | Personal, family or household unless otherwise indicated below ☐ business or commercial |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of |
|---|---|---|---|---|
| _____ % | $ _____ (e) | $ _____ (e) | $ _____ (e) | $ _____ (e) |

(e) means an estimate

YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of | | |
| One Payment of | | |
| One Payment of | | |
| | | Monthly beginning |
| One final payment | | |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)
1. Total Cash Price
   A. Cash Price of Motor Vehicle and Accessories ............ $ _____ (A)
      1. Cash Price Vehicle ............ $ _____
      2. Cash Price Accessories ............ $ _____
      3. Other (Nontaxable) ............
         Describe ............ $ _____
         Describe ............ $ _____
   B. Document Processing Charge (not a governmental fee) ............ $ _____ (B)
   C. Emissions Testing Charge (not a governmental fee) ............ $ _____ (C)
   D. (Optional) Theft Deterrent Device (to whom paid) ............ $ _____ (D)
   E. (Optional) Theft Deterrent Device (to whom paid) ............ $ _____ (E)
   F. (Optional) Theft Deterrent Device (to whom paid) ............ $ _____ (F)
   G. (Optional) Surface Protection Product (to whom paid) ............ $ _____ (G)
   H. (Optional) Surface Protection Product (to whom paid) ............ $ _____ (H)
   I. EV Charging Station (to whom paid) ............ $ _____ (I)
   J. Sales Tax (on taxable items in A through I) ............ $ _____ (J)
   K. Electronic Vehicle Registration or Transfer Charge (not a governmental fee) (to whom paid) ............ $ _____ (K)

### STATEMENT OF INSURANCE
NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

#### Vehicle Insurance
|  |  | Term | Premium |
|---|---|---|---|
| $ _____ Ded. Comp. Fire & Theft | | Mos. | $ _____ |
| $ _____ Ded. Collision | | Mos. | $ _____ |
| Bodily Injury $ _____ Limits | | Mos. | $ _____ |
| Property Damage $ _____ Limits | | Mos. | $ _____ |
| Medical | | Mos. | $ _____ |
| | | Mos. | $ _____ |
| Total Vehicle Insurance Premiums | | | $ _____ (a) |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.
You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____
Seller X _____

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

#### Application for Optional Credit Insurance
☐ Credit Life   ☐ Buyer   ☐ Co-Buyer   ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | Mos. | | $ _____ |
| Credit Disability | Mos. | | $ _____ |
| Total Credit Insurance Premiums | | | $ _____ (b) |

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.
You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday, (2) You are eligible for

J. Sales Tax (on taxable items in A through I) ..........................

K. Electronic Vehicle Registration or Transfer Charge
   (not a governmental fee) (to whom paid) ..................... $ _____ (K)

L. (Optional) Service Contract (to whom paid) ................. $ _____ (L)

M. (Optional) Service Contract (to whom paid) ............... $ _____ (M)

N. (Optional) Service Contract (to whom paid) ................ $ _____ (N)

O. (Optional) Service Contract (to whom paid) ................ $ _____ (O)

P. (Optional) Service Contract (to whom paid) ................ $ _____ (P)

Q. Prior Credit or Lease Balance paid by Seller to

   _____ (e) $ _____ (Q)

   (see downpayment and trade-in calculation)

R. (Optional) Gap Contract (to whom paid) ................... $ _____ (R)

S. (Optional) Used Vehicle Contract Cancellation Option Agreement $ _____ (S)

T. Other (to whom paid) _____

   For _____ $ _____ (T)

**Total Cash Price** (A through T) ................................... $ _____ (1)

**2. Amounts Paid to Public Officials**

A. Vehicle License Fees ...................................... $ _____ (A)

B. Registration/Transfer/Titling Fees ..................... $ _____ (B)

C. California Tire Fees ........................................ $ _____ (C)

D. Other ........................................................ $ _____ (D)

**Total Official Fees** (A through D) ............................... $ _____ (2)

**3. Amount Paid to Insurance Companies**

   (Total premiums from Statement of Insurance column a + b) .... $ _____ (3)

**4.** ☐ State Emissions Certification Fee or ☐ State Emissions Exemption Fee .... $ _____ (4)

**5. Subtotal** (1 through 4) ...................................... $ _____ (5)

**6. Total Downpayment:**

A. Agreed Trade-In Value    Yr. _____ Make _____ $ _____ (A)

   Model _____ Odom. _____

   VIN _____

B. Less Prior Credit or Lease Balance (e) ............... $ _____ (B)

C. Net Trade-In (A less B) (indicate if a negative number) .... $ _____ (C)

D. Deferred Downpayment ................................. $ _____ (D)

E. Manufacturer's Rebate ................................. $ _____ (E)

F. Other ...................................................... $ _____ (F)

G. Cash ...................................................... $ _____ (G)

**Total Downpayment** (C through G) ........................... $ _____ (6)

(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1C above.)

**7. Amount Financed** (5 less 6) .............................. $ _____ (7)

---

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From _____

Amount $ _____ Finance Charge $ _____

Total $ _____ Payable in _____

installments of $ _____

from this Loan is shown in item 6D.

---

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable:

---

above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

You want to buy the credit insurance.

X
_____   _____   ____
Date            Buyer Signature            Age

X
_____   _____   ____
Date            Co-Buyer Signature         Age

---

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1R of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions you are to pay a part of this contract.

Term _____ Miles _____

_____
Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

---

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1L, 1M, 1N, 1O, and/or 1P.

1L Company _____

Term _____ Mos. or _____ Miles

1M Company _____

Term _____ Mos. or _____ Miles

1N Company _____

Term _____ Mos. or _____ Miles

1O Company _____

Term _____ Mos. or _____ Miles

1P Company _____

Term _____ Mos. or _____ Miles

Buyer X _____

---

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____

Co-Buyer Signs X _____

---

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X _____      X _____
Buyer                          Co-Buyer

---

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____      Co-Buyer Signs X _____

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before _____ Year _____   SELLER'S INITIALS _____

S/S X _____

Trade-In Payoff Agreement: Seller agrees to pay the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in 6B. The lienholder or Amount Financed as the Prior Credit or Lease Balance. You understand that the amount quoted is an estimate.

Seller agrees to pay the payoff amount shown in 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund to you any overage Seller receives from your prior lienholder or lessor. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund.

Buyer Signature X _____          Co-Buyer Signature X _____

**Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.**

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____          Co-Buyer Signature X _____

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

| THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION | YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU |
|---|---|

THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a two-day contract cancellation option on used vehicles with a purchase price of less than forty thousand dollars ($40,000), subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION PROVISION ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X _____ Date _____          Co-Buyer Signature X _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle, but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given in this contract.

Other Owner Signature X _____          Address _____

GUARANTY: To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.

Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default, and notices of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X _____ Date _____          Guarantor X _____ Date _____
Address _____          Address _____

Seller Signs _____ Date _____          By X _____          Title _____

LAW  FORM NO. 553-CA-ARB
© 2013 The Reynolds and Reynolds Company TO ORDER: www.reyrey.com 1-800-344-0996 651 15-9291513-273
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.